IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL CUNNINGHAM and :
ANNA CUNNINGHAM, his
wife, and as Guardians of SCOTT :
CUNNINGHAM, and CLAYTON
HULSIZER, III, :
               Plaintiffs                    Civil No. 4:03-CV-0268

                       :

        v.                      Judge McClure

                       :

MILCO INDUSTRIES INC., and
BLOOMSBURG MUNICIPAL :
SEWER AUTHORITY,
             Defendants  :

**M E M O R A N D U M**

April 26, 2005

**BACKGROUND:**

On February 12, 2003, plaintiffs Paul and Anna Cunningham, for themselves and as guardians of Scott Cunningham, and Clayton Hulsizer III, commenced this action by filing a complaint against defendants Milco Industries, Inc. ("Milco") and the Municipal Sewer Authority of the Town of Bloomsburg ("Authority"). Plaintiffs' claims arise out of the alleged discharge of hazardous substances from the Authority's sewer system into the ground around plaintiffs' properties. Plaintiffs allege, among other things, that defendant failed to maintain its sanitary

1

sewer system so as to allow leakage of waste water, effluent vapors, residual chemical waste and hazardous substances into the ground around plaintiffs' property causing fumes, waste water, and odors to seep into their property. Plaintiffs assert that as a result they have suffered permanent contamination of their real property. (Rec. Doc. No. 1, at 3, ¶ 10.) Plaintiffs also aver that as a result of their exposure to "hazardous substances" from the Authority's sewer system they have a "significantly increased risk of contracting cancer." (Rec. Doc. No. 1, at 16-17, ¶¶ 60, 61, 65, 66.)

The complaint states twelve causes of action against the defendants in the form of recovery of response costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), recovery of response costs under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), and state strict liability, negligence, nuisance, and medical monitoring claims. Plaintiffs moved for voluntary dismissal of their claims against Milco, which was granted on January 29, 2004. On March 3, 2004, the court granted a similar motion by the Authority to voluntarily dismiss its cross claims against Milco. In plaintiffs' opposing brief they withdrew their strict liability claims (Counts III & IV). (Rec. Doc. No. 54, at 11-12.)

Now pending before the court is the Authority's motion for summary

2

judgment.  For the following reasons the court will grant the Authority's motion for summary judgment.

## DISCUSSION:

### I.  Standard of Review

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law."  Fed. R. Civ. 56(c).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'"  Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party.  Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, (3d Cir. 1995).  The nonmoving party, however, cannot defeat a motion for summary

judgment by merely offering general denials, vague allegations, or conclusory

statements; rather the party must point to specific evidence in the record that

demonstrates that there is a genuine issue as to a material fact.  See Celotex, 477

U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d

Cir. 1999).

## II.  Factual Background

A.  Plaintiffs' General Denials to Defendant's Statement of Material Facts

Pursuant to Local Rule 56.1, the Authority filed a separate,[1] short and

concise statement of material facts.  (Rec. Doc. No. 48, Ex. Def. Statement of

Material Facts.)  On August 2, 2004, plaintiffs filed a response statement of material

facts.  In their response, plaintiffs have denied several facts because they are

"without sufficient information to form a belief as to the truth or falsity of the

averments."  (See, e.g., Rec. Doc. No. 55, ¶¶ 8, 9, 21, 23, etc.)  As defendant has

noted, by responding in this manner at the summary judgment stage, plaintiffs are

admitting those facts that they generally denied where defendant has supported the

statement with citations to evidence in the record.  Local Rule 56.1 provides that,

"[s]tatements of material facts in support of, or in opposition to, a motion shall

---

[1] The statement appeared electronically as an attachment to the Authority's
motion for summary judgment.

include references to the parts of the record that support the statements.  All

material facts set forth in the statement required to be served by the moving party

will be deemed to be admitted unless controverted by the statement required to be

served by the opposing party."  LR 56.1.  As noted in our previous standard of

review section, the nonmoving party, at the summary judgment stage cannot simply

make general denials, but rather, must point to specific evidence in the record that

demonstrates there is a genuine issue of material fact.  See Celotex 477 U.S. at 32.

Plaintiffs have not pointed to specific evidence to controvert  defendant's

statements.

### B.  Plaintiffs' Inadmissible Evidence (Exhibits 13 & 14)

On August 9, 2004, plaintiffs filed two documents with the court, both

labeled as exhibits to plaintiffs' brief in opposition.[2]  (Rec. Doc. Nos. 57 & 58.)

One document is a quote provided by Environmental Products & Services of

Vermont, Inc. to HEPA vacuum the inside of a 2,000 square foot dwelling. (Ex. 13,

Pls. Br. Opp., Rec. Doc. No. 57.)  The site listed for the quote is 409 E. 9th Street,

Bloomsburg, Pennsylvania, plaintiff Hulsizer's residence.  (Id.)  The estimated

price for the cleaning is $7,350.00 and is dated August 2, 2004.  (Id.)  The other

---

[2]  In the ECF system the two exhibits appear to have been mislabeled, each
identified as the other.

exhibit is a series of medical lab results from the Bloomsburg Hospital

Laboratories.  (Ex. 14, Pls. Br. Opp., Rec. Doc. No. 58.)  The results include tests

conducted on (1) Anna Mae Cunningham on July 28, 2004; (2) Scott E.

Cunningham on May 8, 2004; and (3) Paul E. Cunningham on May 8, 2004.  (Id.)

Both of the exhibits filed on August 9, 2004, were not previously disclosed to

defendant.

On May 22, 2003, a scheduling order set the fact discovery deadline for

December 15, 2003.  (Rec. Doc. No. 16.)  On December 23, 2003, we denied

plaintiffs' request to extend this deadline and stated the May 2003 order remained

in full force and effect.  (Order, Rec. Doc. No. 25.)  Plaintiffs cannot use the ECF

system to spring last-minute and prejudicial factual disclosures on defendant.

Furthermore, the contents of both of these documents were produced well after the

close of fact discovery.  Therefore, both of plaintiffs' exhibits 13 and 14 (Rec.

Doc. Nos. 57 & 58), must be stricken from the record.

## C.  Statement of Undisputed Material Facts

Defendant, the Municipal Authority of the Town of Bloomsburg

("Authority"), was created under the provisions of the Pennsylvania Municipality

Authorities Act, 53 Pa. C.S.A. § 5601, et seq..(Rec. Doc. No. 48, Ex. M, ¶ 3.)

The Authority owns and operates a sewage treatment plant, which is a "publicly

owned treatment works" under the federal Clean Water Act.  (Rec. Doc. No. 48, Ex. J, ¶ 7.)  The Authority owns and operates the sanitary sewers located within the town of Bloomsburg.  These sewers are comprised of approximately 45 miles of underground pipes.  The Town of Bloomsburg has approximately 4,400 housing units.  The Authority's sewers accept and convey domestic, commercial, and industrial wastes, deposited therein by others, to the Sewage Treatment Plant.  In 1969 the Authority adopted rules and regulations which prohibited the introduction of materials into the sewer system that "contain[] a toxic or poisonous substance" or which "contain[] noxious or malodorous gases or substance[s] capable of creating a public nuisance."  (Rec. Doc. No. 48, Ex. P.)

Plaintiffs Paul and Anna Cunningham reside at 815 Cherry Street in the Town of Bloomsburg.  The Cunninghams own the property in which they reside; Anna and Paul Cunningham had lived in the house continuously since approximately 1957, until they moved out March 3, 2001 to live with their daughter.  The Cunningham's daughter, Kerry Bozung, lives at 407 East Ninth Street.  That property is also owned by the Cunninghams.  Plaintiff Clayton Hulsizer resides and owns the property at 409 East Ninth Street in the Town of Bloomsburg.  Hulsizer has lived at 409 East Ninth Street since 1994 or 1996, before that since 1990, he lived at 410 East Eighth Street, which is directly behind 409 East Ninth Street.

7

(Rec. Doc. No. 48, Ex. G, at 10.)  The Hulsizer, Cunningham, and Bozung properties are adjacent to one another.  The Cunningham house is located north of the Hulsizer and Bozung houses; the Hulsizer house is located east of the Bozung house (collectively the "Cherry Street Area").

The Authority's sanitary sewers are located beneath the yards south of the Cunningham house and north of the Hulsizer and Bozung homes and also under Cherry Street to the south and west of the Cunningham and Bozung homes.  The Cunningham, Bozung, and Hulsizer homes are connected to the Authority's sewer system by means of pipes, known as laterals, owned by the respective homeowners.  The lateral attached to the Cunningham house was observed as being misaligned with the joint to the main sewer line.

Prior to March 3, 2001, the Authority was contacted on only one occasion regarding the odors in the Cherry Street Area; that contact occurred on December 19, 1996.  (Rec. Doc. No. 48, Ex. J, ¶ 23.)  No other reports of odors in the Cherry Street Area were made to the Authority between December 19, 1996 and March 19, 2001.

Beginning on March 3, 2001, and at various times thereafter, one or more of the plaintiffs experienced odors either inside their homes or in the outside air in the Cherry Street Area.  (Rec. Doc. No. 48, Ex. N.)  On March 3, 2001, the

Cunninghams reported the odor inside their home to various entities, including the Town of Bloomsburg Fire Department, but they did not notify the Authority on that date. (Rec. Doc. No. 48, Ex. H, Ex. C-2.) On or about March 9, 2001, the Pennsylvania Department of Environmental Protection ("PaDEP") began investigating the odors. (Rec. Doc. No. 48, Ex. A, at 3, § 2.1.)

On March 19, 2001, the Authority's superintendent, Ronald Sutton, was informed by the Town of Bloomsburg Emergency Management Coordinator of the reports of odors in the Eighth Street Area, which is about a block from plaintiffs' homes. Defendant asserts on the basis of Sutton's affidavit, and plaintiffs make only a general denial based on insufficient knowledge, that this was the first time that anyone notified the Authority of odors in the Cherry Street Area since 1996. (Rec. Doc. No. 48, Ex. J, ¶ 23.) On March 20, 2001, the Authority Superintendent was informed more specifically that odors were experienced in the vicinity of 815 Cherry Street. (Rec. Doc. No. 48, Ex. J, ¶ 22.)

Defendant avers that its "[s]ewers must allow for some exchange of air in order to function properly." (Rec. Doc. No. 48, ¶ 46.) They support this assertion with a citation to the expert report of Joseph Strauch which states that gravity sewers like those in Bloomsburg need air in order to function properly and that standards for the construction of manholes typically allows for the flow of air.

9

(Rec. Doc. No. 48, Ex. L, at 8.)  Again, plaintiffs make only a general denial of this assertion.  Both parties agree that sewage emits odors, and it is normal for some odors to be emitted from sewers from time to time.

Both parties agree that the Authority does not own televising equipment for inspecting the insides of sewer pipes.  (Rec. Doc. No. 48, ¶ 32 & Rec. Doc. No. 55, ¶ 32.)  They also agree that when televisual inspection is necessary it is provided by a private contractor.  (Id.)

In May of 2001, plaintiffs were evacuated to a motel room on one occasion for three days.  The Cunninghams disposed of some stored foodstuffs because they were advised to do so by the PaDEP.

## D.  Statement of Disputed Facts

At the outset we noted that in many instances plaintiffs denied defendant's statements of facts, which were supported by citations to evidence in the record, by either making a non-responsive argument, an argument unsupported by citations to the record, or an assertion that they were without sufficient information to admit or deny.  Under this section we gather and address several of those denials.

## 1.  Prior Lawsuits

Defendant states that prior to this case, the Authority has never been subject to a claim that real property has been permanently contaminated by leakage from its

sewers.  (Rec. Doc. No. 48, ¶ 8.)  Defendant also asserts that the Authority has

never been subject to a claim that persons were exposed to cancer-causing

chemicals in the sewer system.  (Rec. Doc. No. 48, ¶ 9.)  Defendant supports this

assertion with the affidavits of Chairman of the Authority Robert Linn and

Authority Superintendent Ronald Sutton.  (Rec. Doc. No. 48, Ex. J, ¶¶ 16-17 &

Ex. M, ¶¶ 5-6.)  Plaintiffs make a general denial to both assertions.

## 2.  Broken & Misaligned Lateral

Defendant asserts that the lateral attached to the Cunningham house was

observed to be broken and with misaligned joints.  To support its claim defendant

cites to the Baker Environmental Inc. expert report that contained the evaluation of

the TV scoping of the sewers.  The TV scope "revealed that the lateral sewer at

815 Cherry Street was in bad condition; cracked, partially collapsed and infiltrated

by roots.  The lateral also did not have a lateral trap.  On July 3, 2001, Roto-Rooter

replaced the lateral and installed two clean outs, a lateral trap and a standpipe to

vent sewer gases above the roofline of the house."  (Rec. Doc. No. 48, Ex. A, §

4.3.4, at 26.)  Defendant also cites to the deposition testimony of plaintiff's expert

Dr. Cocciardi in which he stated that there were cracks in the "lateral sewer line that

went from the secondary sewer line into the home."  (Rec. Doc. No. 48, Ex. K, at

86-87.)  Dr. Cocciardi testified that he believes that one pathway that hazardous

11

substances could travel from the sewers and be released onto the Cunningham property is through the Cunninghams' sewer lateral.  (Rec. Doc. No. 48, Ex. K, at 90-91, 98, 121-22.)  Finally, defendant cites to the deposition testimony of Ronald Sutton, in which he states that the PaDEP hired Roto-Rooter to replace the lateral, and that the lateral sewer was misaligned at the joints with the sewer main.  (Rec. Doc. No. 48, Ex. I, at 66-69.)  Sutton further testified and clarified that the lateral sewer line was missing a piece and the bottom of the lateral pipe was completely out where it went to join the main line.  (Id. at 67-68.)

Plaintiffs admit that the lateral was misaligned from the Cunningham home to the main sewer.  However, they assert that it was defendant who was responsible for connecting the lateral to the main sewer.  (Rec. Doc. No. 56, Ex. 1, at 395.) Puzzlingly, plaintiffs also deny that Dr. Cocciardi stated that a pathway for hazardous substances to be released onto plaintiffs' property is through the lateral. They argue that Dr. Cocciardi indicated a "complete pathway from the sanitary sewer with connections appears evident.  The adjacent storm sewer conduit allows for another proximate source.  The 7.8' of slag in the 815 Cherry Street property was a preferential pathway to the home basement."  (Rec. Doc. No. 55, at 3, ¶ 17 (citing Rec. Doc. No. 56, ex. 3, at 3-4)).  However, this evidence does not contradict the assertion that one pathway for hazardous substances onto plaintiffs'

12

property could have been through cracks in the lateral sewer line.

### 3.  1996 Investigation

Defendant contends that when the Authority investigated the December 1996 odor complaint it found no damage or blockage in the sewer system in the Cherry Street Area.  (Rec. Doc. No. 48, ¶ 22.)  Plaintiffs deny this assertion, but it appears plaintiffs are really objecting to how the parties characterized the investigation.  The record indicates that when two Authority employees investigated the Cunningham's 1996 complaint they noted that it was not the Authority's problem and that the Cunningham's were on the sewer system and everything was running alright.  (Rec. Doc. No. 56, Ex. 1, at 325-26.)

### 4.  Physical Inspection of Pipes

Defendant asserts on the basis of Ronald Sutton's affidavit, that due to the physical configuration of the sewer pipes in the Cherry Street Area, it is not possible to observe the inside of the pipe for more than a few feet by visual inspection.  (Rec. Doc. No. 48, Ex. J, at ¶¶ 10-12).  Plaintiffs only make a general denial in response to this assertion.  Defendant, also on the basis of Sutton's affidavit, states that in order to observe the inside of the pipe for more than a few feet special televising equipment is necessary.  (Id., Ex. J, at ¶ 13.)  Plaintiffs cite no evidence to the contrary, but assert that "[t]here is no special televising

equipment required to visualize pipes.  Every Sewer Authority in the State should

have the capabilities of examining their Sewer Systems and inspecting same to

make sure they are safe and in good and proper repair.  Consultants can be used

for this purpose."  (Rec. Doc. No. 55, at 4, ¶ 31.)  This is not responsive to

defendant's assertion that televising equipment is necessary in order to view the

pipes in the Cherry Street Area for more than a few feet.

Defendant states that on "March 29, 2001, the Authority, through a

contractor, conducted a televisual inspection of the sewer pipe between the houses

(from Manhole 593 to 594), which showed that it was in good condition with minor

normal cracking."  (Rec. Doc. No. 48, ¶ 33.)  Defendant supports this assertion

with citations to deposition testimony by Sutton, Sutton's affidavit, a letter from

Sutton, and the findings in Joseph Strauch's expert report.  (Rec. Doc. No. 48,

Exs. I, at 63, 109, Ex. O, Ex. L, at 7-8, t.6.)  Plaintiffs assert that Sutton himself

decided to replace those pipes.  (Rec. Doc. No. 55, at 4-5, ¶ 33 (citing Rec. Doc.

No. 56, Ex. 1, at 595-96.)  Plaintiffs also cite to an excerpt from Sutton's

deposition testimony where he refers to the head of the DEP in Williamsport [name

not indicated in excerpt], who stated that "Bloomsburg has dilapidated sewers."

(Rec. Doc. No. 56, Ex. 4, at 70.)

On March 29, 2001, the Authority also conducted smoke testing and

observed that smoke escaped the sewer and entered a nearby storm sewer.  (Rec.

Doc. No. 48, Ex. J, at 27 & Ex. I, at 80 & 85.)  Plaintiffs admit that this occurred

and adds that Sutton testified that PaDEP's Kevin Kroculick also saw smoke

coming into the Cunningham's basement.  (Rec. Doc. No. 56, Ex. 1, at 635.)

Both parties agree that subsequent to March 29, 2001, the sewer line from

Manhole 593 to 591, which lies underneath Cherry Street was observed using

televisual inspection, to be cracked and broken and requiring repair.  (Rec. Doc.

No. 48, Ex. I at 61-62 & Ex. L at t.6.)  Defendant asserts on the basis of Sutton's

affidavit and Strauch's expert report, that the damaged portions of the Cherry

Street section of sewer were twenty feet or more from the nearest manhole and

were not observable without inserting televisual equipment.  (Rec. Doc. No. 48, Ex.

J, ¶¶ 12-13 & Ex. L, at 8.)  Plaintiffs make only a general denial to this assertion

which is insufficient at this stage in the litigation.

### 5.  Contamination in the Cherry Street Area

It is undisputed that the PaDEP and/or its contractor, Baker Environmental,

Inc., tested the groundwater in the vicinity of the Cherry Street Area and did not

identify any contamination due to escaped sewage.  (Rec. Doc. No. 48, ¶ 37 &

Rec. Doc. No. 55, ¶ 37.)  Defendant also contends that the PaDEP and/or its

contractor tested soils in the Cherry Street Area and did not identify any

contamination due to escaped sewage. (Rec. Doc. No. 48, ex. A, at 5, § 2.3 & at 27, § 5.1 & Ex. B, at 4.) Plaintiffs, however, direct the court to Sutton's testimony where he indicated that there was a pile of soil removed from the excavation site of the main sewer line, along with the remains of the main sewer line, that contained a PID reading indicating contamination. (Rec. Doc. No. 56, Ex. 1, at 337-38.)[3]

Defendant cites to the Baker Report in support of the assertion that the storm sewers in the Cherry Street Area were not contaminated due to escaped sewage. (Rec. Doc. No. 56, Ex. 5, at 28, § 5.3.3 (Defendant's citation was not attached).) In response, plaintiffs make a general citation to the Baker Report that is non-responsive. Defendant also asserts that PaDEP officials, based on the results of the PaDEP investigation, have stated that there was no contamination in the waters on or under plaintiffs' properties in the Cherry Street Area. (Rec. Doc. No. 48, Exs. B, C, D, and E.) Plaintiffs' response is again non-responsive to the matter, simply stating that the "affidavits clearly state that waters of the Commonwealth include the sewer system and that there was contamination in that sewer system." (Rec. Doc. No. 55, at 6, ¶ 40.)

Defendant asserts that PaDEP officials have stated that they are not aware of

---

[3] We note that the Baker report found that "the soil at 815 Cherry Street is not contaminated with the chemicals detected in the vapor samples and, therefore is not the source of the chemical odors." (Rec. Doc. No. 56, Ex. 5, at 27, § 5.1.)

any evidence showing that sewage was discharged from the sewers in the Cherry Street Area.  (Rec. Doc. No. 48, Exs. B, C, D, and E.)  Plaintiffs' response is that the affidavits do not clearly support this assertion and that contaminated soil was later identified.  We agree with defendant that the contents of the affidavits clearly indicate that the officials are not aware of any evidence showing that sewage was discharged from the sewers in the Cherry Street Area.

Defendant contends that plaintiffs have not conducted any testing of soils or waters and have not identified any contamination on their real property.  For support, defendant cites to the deposition of Paul Cunningham and Clayton Hulsizer which indicated that they hired no one. (Rec. Doc. No. 48, Ex. F, at 24, 110-11 & Ex. G, at 118-19, 136-37, and 145.)  Again, plaintiffs' response is non-responsive, stating that it has been previously indicated that the property was contaminated and without any citation, shockingly asserting "[t]here is no scientific method to establish whether the slag foundation contains pockets of gases and/or sewage underneath the property."  (Rec. Doc. No. 55, at 6, ¶ 42.)  If this is the case, how will plaintiffs ever prove that their land is contaminated at trial?

### 6.  Notice to Authority of Sewer's Condition

Defendant asserts, on the basis of Sutton's affidavit, that the sewers in question did not collapse so as to cause the ground to subside or to create any

other physical manifestation of their condition. (Rec. Doc. No. 48, ¶ 43.)  Again,

plaintiffs only respond by making a general denial, which is inappropriate at this

stage in the litigation.

Defendant asserts, on the basis of Sutton's affidavit, that the Authority's

sewers in the Cherry Street Area are made of clay pipe and were installed

approximately 75 years ago.  (Rec. Doc. No. 48, Ex. J, ¶¶ 18-19.)  Plaintiffs deny

this approximation because Sutton has indicated in deposition testimony that

although he was told they are approximately 75 years old, nobody knows exactly

when they were installed.  (Rec. Doc. No. 56, Ex. 4, at 30.)  We are convinced that

without evidence to the contrary, which plaintiffs noticeably have not produced,

Sutton's approximation of the sewers being 75 years old is appropriate.

Defendant contends that the sewer pipes in the Cherry Street Area were in

normal condition for sewers of their age and materials of construction; and that this

normal condition includes some cracks and imperfections.  Defendant supported

its assertion with cites to the PaDEP Operations Chief of the Water Management

Program Thomas Schmick's affidavit which states the same (Rec. Doc. No. 48,

Ex. E, ¶ 8) and to the expert report of Joseph Strauch which stated that "[b]ased

upon a reasonable degree of engineering certainty, the comparison shows that the

Authority sewers in question were in a condition that normally exists in sewers of a

18

similar age and construction materials in communities similar to Bloomsburg."

(Rec. Doc. No. 48, Ex. L, at 6-7). Plaintiffs contest these expert opinions by citing

to the deposition testimony of Sutton which indicated that at one point the head of

DEP in Williamsport stated that "Bloomsburg has dilapidated sewers." (Rec.

Doc. No. 56, Ex. 4, at 70.) This is not sufficient to create a genuine issue as to

defendant's expert opinions.

### 7. Costs Incurred by Plaintiffs

Defendant contends that plaintiffs incurred no costs associated with

investigation, monitoring, cleanup, or remediation of alleged contamination of soils

or water on under their properties. (Rec. Doc. No. 48, Ex. F, at 24, 110-11, Ex. G,

at 118-19, 136-37, and 145.) Defendant also asserts that plaintiffs incurred no

costs associated with the May 2001 evacuation as all costs were paid by the Red

Cross. (Rec. Doc. No. 48, Ex. G, at 141.) Plaintiffs assert that the "Cunninghams

have incurred medical expenses in the amount of $394.76, costs of testing from Pro

Lab for Hazardous Chemicals incurred on June 27, 2001 and July 29, 2001 in the

amount of $21.18. Fees for testing of the property conducted by Cocciardi and

Associates in excess of $20,000.00." (Rec. Doc. No. 55, at 7, ¶ 49 (citing Rec.

Doc. No. 56, Ex 6.) They continue, "Mr. Hulsizer also had losses that were

incurred as a result of the contamination, copies of which have been provided to

the Defendants.  Plaintiffs will incur response costs to seal basements, clean home

and install ventilation system . . . Plaintiffs reserve the right to supplement their

responses in the event the amount of said costs become an issue."  (Rec. Doc. No.

55, at 8, ¶ 49.)  As to the costs during the evacuation, plaintiffs assert that they

incurred costs for food by citing to Hulsizer's affidavit.  (Rec. Doc. No. 56, Ex. 7.)

### 8.  Plaintiffs Notice to Sue Under Citizen Suit Provision of HSCA

Defendant contends that plaintiffs did not notify the PaDEP, the Authority,

or the Town of Bloomsburg of an intent to file a citizen suit under the Pennsylvania

Hazardous Sites Cleanup Act.  (Rec. Doc. No. 48, Ex. M, ¶ 7.)  Plaintiffs deny this

assertion by stating that both written and oral notice was given to "all parties" that

plaintiffs would seek legal redress and that the Press Enterprise published an article

confirming the notice on October 9, 2002.  (Rec. Doc. No. 56, Ex. 8.)

### 9.  Cancer Threat to Plaintiffs

Defendant asserts that Hulsizer's claim that he has an increased risk of

contracting cancer as a result of the vapors is based on the information in the Baker

Report, namely that the chemicals detected in the air are carcinogenic, and not on

the opinion of an examining physician.  Defendant's assertion is supported by

Hulsizer's deposition testimony.  (Rec. Doc. No. 48, Ex. G, at 147, 152. (stating

his belief is based on "what I read in the report")).  Plaintiffs assert that the

deposition just indicates that his fear was based upon a review of the report and there was no testimony indicating that he had been examined by a physician.

Defendant contends, and supports with appropriate citation to discovery, that Mrs. Cunningham's physician reported that the exposure to the odors would not place her at a high risk for future health problems; he reassured her that the risk is merely a remote theoretical possibility. (Rec. Doc. No. 48, Ex. Q, at 6-7.) Defendant also contends, and supports with appropriate citation to discovery, that Scott Cunningham's physician told the family that he would probably not have any long term effects as a result of the odors. (Rec. Doc. No. 48, Ex. R, at 4.) Finally defendant contends, and supports with appropriate citation to discovery, that Paul Cunningham's physician did not tell him that he had an increased risk of contracting cancer as a result of the odors. (Rec. Doc. No. 48, Ex. S.) Plaintiffs attempt to deny all of these allegations by asserting that "Dr. Michael Holland indicated that she [Mrs. Cunningham] was not at a high risk for a 'significant long term sequela,' but did indicate that he would recommend medical monitoring and that she should not go back into the exposure. She has continued to treat with Dr. Meldrum and the records have been provided to the Defendant." (Rec. Doc. No. 55, at 9, ¶¶ 55-57.) Although Dr. Holland initially recommended testing, the parties do not dispute that Dr. Meldrum has since recommended that no further testing be

done for any of the family members.  (Rec. Doc. No. 48, Ex. F, at 13-15.)

Defendant contends that the "EPA sets an acceptable level of cancer risk due to exposure of chemicals at one in one million."  For support it cites to the expert report of Robert Hubbard and John Francis of Key Environmental Inc., which states that the:

> U.S. EPA has defined the range of 1E-4 to 1E-6 [1-in-1,000,000] as the "target range" for Resource Conservation and Recovery Act Corrective Action facilities and hazardous waste sites addressed under CERCLA.  Typically, individual or cumulative CRs greater than 1E-4 (a 1-in-10,000 risk) are considered a level at which corrective or remedial action is warranted. Cumulative CRs below 1E-6 are typically considered to be "acceptable."  Similarly, the Act 2 regulations and guidance use a target lifetime incremental cancer risk of 1E-5 (the midpoint of the U.S. EPA target risk range) as the basis for development of Statewide Health Standards.

(Rec. Doc. No. 48, Ex. T, at 4-5.)

Defendant asserts, on the basis of the Key Environmental Inc. report, that the potential future risk of cancer due to the highest measured concentrations found in the Cunnnigham home, estimated using accepted scientific procedures, is approximately one in fifteen million.  (Rec. Doc. No. 48, Ex. T, at 4-5--4-6, T.6.) (Stating that in regards to the Cunningham home, "all of the individual chemical cancer risks, as well as the cumulative cancer risk are well below even the lower

bound of the U.S. EPA target risk range.  The estimated lifetime incremental cancer risk (i.e., probability) as a result of the short duration of exposure is estimated to be 1 in 15 million.") Defendant also states, again on the basis of the Key Environmental report, that the cumulative potential non-cancer health risk due to the highest measured concentrations of the chemicals in the Cunningham home, estimated using accepted scientific procedures is less than the level of concern of 1.0.

Plaintiffs make a general denial and offer non-responsive arguments to defendant's citations to scientific evidence.  Plaintiffs state that "Dr. Cocciardi indicates that hazardous substances, during both acute and intermediate exposure time frames, were present in the Cunningham basement and home and in the Hulsizer property in 2001 and 2002 which had the potential for cancer risk."  (Rec. Doc. No. 55, at 9-11, ¶¶ 59-61.)  These responses do not address at what level a cancer risk is considered acceptable by the EPA, or offer a different determination of the cumulative potential cancer and non-cancer health risks found in the Cunningham home.

### III.  Plaintiffs' CERCLA Response Costs Claims (Counts I & II)

Plaintiffs seek response costs under CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4), because the "[d]efendants released the hazardous substance which has necessitated the clean up, property damage and personal injuries to which they

are responsible."  (Compl., Rec Doc. No. 1, ¶¶ 20-21, 24-25.)

Congress had two main goals in enacting CERCLA: (1) to encourage the expeditious cleanup of potentially dangerous hazardous waste sites, and (2) to impose the costs of the cleanup on the parties responsible for the contamination. See United States v. CDMG Realty Co., 96 F.3d 706, 717 (3d Cir. 1996).  Section 107 of CERCLA, which plaintiffs rely on in this action, promotes these goals by encouraging private parties to spend money on the cleanup of hazardous waste sites.

Although CERCLA promotes private parties' cleanup of hazardous waste sites, and is designed to hold polluters liable for the cleanup costs their hazardous waste creates, the statute "does not provide compensation to a private party for damages resulting from contamination."  Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 91 (2d Cir. 2000) (per curiam); see Artesian Water Co. v. Gov't of New Castle County, 851 F.2d 643, 649 (3d Cir. 1988) ("One of the deliberate omissions in the compromise bill was reimbursement for property or income loss."); see also Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005) ("CERCLA is not a general vehicle for toxic tort claims."); Holloway v. Gaylord Chem., 922 F.Supp. 1154, 1158-60 (E.D. La. 1996) (stating CERCLA does not cover "compensation to private parties for bodily and economic injury traditionally within the reach of state

tort law").

A plaintiff seeking to establish CERCLA liability under section 107 must prove: (1) that the defendant is a [potentially responsible party]; (2) that hazardous substances were disposed of at a "facility"; (3) that there has been a "release" or "threatened" release of hazardous substances from the facility into the environment; and (4) that the release or threatened release has required or will require the plaintiff to incur "response costs." New Jersey Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103-04 (3d Cir. 1999) (citations omitted); Matter of Reading Co.; 115 F.3d 1111, 1117-18 (3d Cir. 1997); Degussa Constr. Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 399 (E.D. Pa. 2003).

In the Third Circuit it is not necessary for a private plaintiff seeking recovery of response costs under section 107 to prove that its property was actually contaminated. Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1218-19 (3d Cir. 1993) (citing Artesian Water Co., 851 F.2d at 651). Obviously, however, a section 107 plaintiff must have incurred response costs in order to sue for them. See Holloway, 922 F.Supp. at 1158. A section 107 plaintiff may recover for monitoring and evaluation costs if it can show that (1) the defendant's release or the threatened release of hazardous material produced a reasonable risk of contamination to the plaintiff's property, and (2) the plaintiff incurred its monitoring

25

and evaluation costs in a reasonable manner.  Lansford-Coaldale Joint Water Auth., 4 F.3d at 1219.

The Third Circuit has held that only an innocent party that has undertaken hazardous waste cleanup may pursue an action for recovery under section 107. PPG Indus., 197 F.3d at 104.  CERCLA section 107 (a)(1)-(4) identifies four different types of potentially responsible parties.  A potentially responsible party cannot bring a section 107 action against another potentially responsible party. New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1126 (3d Cir. 1997).

Private party plaintiffs under section 107 are entitled to recover "necessary costs of response . . . consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  Private parties are not entitled to recover litigation-related expenses in an action to recover response costs pursuant to section 107(a)(4)(B). Blackhorse Lane Assoc. v. Dow Chem. Corp., 228 F.3d 275, 294-95 (3d Cir. 2000); Redland Soccer Club, Inc. v. Dep't of the Army, 55 F.3d 827, 849-50 (3d Cir. 1995) (holding section 107 plaintiffs' attorneys fees, expert witness fees, and health risk assessment study costs, were litigation-related expenses and not recoverable); see also Keytronic v. United States, 511 U.S. 809, 818-20 (1994) (holding attorney's fees are not response costs under CERCLA, but that "lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of

response in and of itself under the terms of §§ 107(a)(4)(B)") (emphasis added).

The Authority's motion for summary judgment advances three arguments in its favor on the CERCLA counts: (1) that there was no "release" or "threatened release" of a hazardous substance from its sewers; (2) that plaintiffs incurred no response costs; and (3) that the Cunninghams, as owners of a broken sewer lateral, are potentially responsible parties.  Because we will find that plaintiffs incurred no response costs we do not address defendant's third argument.

### (1) Defendant Asserts that there was No Release or Threatened Release

Section 101(22) of CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).  In order to be a "hazardous substance" under CERCLA a pollutant must be included within the designated substances listed in section 101(14).  42 U.S.C. § 9601(14).

As already noted, a section 107 plaintiff need not actually prove that its property was contaminated by a hazardous substance.  The threat of a hazardous release along with the incurrence of monitoring and evaluation costs in a reasonable manner by the party threatened constitutes grounds for a plaintiff to recover under CERCLA.

The complaint alleges that the crack in the Authority's sewers contaminated

plaintiffs' property with "residual chemical waste and hazardous substances."
(Rec. Doc. No. 1, at 3-4, ¶¶ 10, 12.)  Plaintiffs aver that this caused permanent
contamination of their property by chemicals which include, but are not limited to,
"benzene, chloroform, toluene, trimethylebenzene, chlorotoluene and other
chemicals, some of which are carcinogens."  (Rec. Doc. No. 1, at 3-4, ¶¶ 10, 12.)

Defendant asserts that plaintiffs have produced no facts which demonstrate
that a release occurred.  The Authority cites to the July 23, 2001 Baker
Environmental Report's determination that the soil and ground water at plaintiffs'
property did not contain pollutants.  (Rec. Doc. No. 48, Ex. A & Rec. Doc. No.
56, Ex. 5, §§ 2.3, 5.1, 5.2.)  Defendant also provides several affidavits from PaDEP
officials in which they conclude that there was no discharge of sewage into the soil
or groundwater surrounding plaintiffs' property.  (Rec. Doc. No. 48, Exs. B, C &
D.)

In response plaintiffs assert that the same July 23, 2001 Baker Environmental
Report (Rec. Doc. No. 56, Ex. 5), the July 2001 final report of Gannet Flemming's
excavation and sampling of soil around the sewers from April 30, 2001 through
May 3, 2001 (Rec. Doc. No. 56, Ex. 10), and plaintiffs' February 16, 2004 expert
report from Dr. Joseph Cocciardi (Rec. Doc. No. 56, Ex. 2), establish that there
was a release of hazardous substances.  There is enough evidence in the record,

particularly the findings of the July 23, 2001 Baker Report which indicates that the same concentrations of target compounds were in the sewer as those that appear in the Cunninghams' basement (Rec. Doc. No. 56, Ex. 5, §§ 2.0, 4.3.1, 5.5), so as to create a genuine issue of material fact as to whether there was a threatened release of hazardous substances, if not an actual release.  The Baker Report advised that based on the chemical compounds detected at 815 Cherry Street no one should live in the house until the vapors were mitigated.  (Rec. Doc. No. 56, Ex. 5, § 2.2, at 4.)

### (2) Plaintiffs Incurred No Response Costs

Defendant also asserts that plaintiffs incurred no response costs.  Plaintiffs' opposing brief asserts that they have incurred the following response costs: (1) the costs for radon testing on July 13, July 27, and July 29, 2001; (2) the costs of medical tests conducted on plaintiffs by Dr. Robert Meldrum and Dr. Michael Holland; (3) the costs incurred during plaintiffs' evacuation of their home for "food and expenses which otherwise would have been unnecessary"; (4) the cost of "hiring Cocciardi and Associates to investigate the release and to determine the extent of any hazards and the remedy to return to the property";[4] (5) future costs that plaintiffs will incur to develop a vapor mitigation system and to seal basement

---

[4]Not surprisingly, plaintiffs' attorneys list this as the most important "response" cost.

walls for protection; and finally (6) costs incurred by the Disaster Relief and

Emergency Assistance Act and the American Red Cross during plaintiffs

evacuation from their premises.  Plaintiffs' exhibit six to their motion opposing

summary judgment provides evidence relating to these "response costs."  Plaintiffs

provide only scant citations to the record to support these costs.

First, plaintiffs assert that the money spent on radon kits in July 2001

constituted response costs.  Plaintiffs have not adequately demonstrated to the

court why we should consider the radon test kits a response to any threat.  Radon

is an odorless and colorless gas that naturally occurs through the decay of uranium

in the soil, rock, and water.  See Dorland's Illustrated Medical Dictionary 1408

(28th ed. 1994); U.S. Environmental Protection Agency, Radon Information -

Home, *at* http://www.epa.gov/radiation/radionuclides/radon.htm (last updated Nov.

30, 2004).  Radon can leak into a home, through openings in basement foundations

and can then attain hazardous carcinogenic levels.  See Snyder v. Roach Bros.

Realtors, 17 Pa. D. & C.4th 60, 61 (Pa. D. & C. 1992); see generally U.S.

Environmental Protection Agency, Indoor Air Quality (IAQ) - Radon, *at*

http://www.epa.gov/radon/index.html (last updated Mar. 10, 2005) (answering

several frequently asked questions about radon).  The costs associated with

plaintiffs' radon kits cannot be characterized as a response cost under CERCLA,

for to do so would unduly stretch the meaning of the federal statute. Mrs. Cunningham testified she did not know why the radon testing was conducted. (Rec. Doc. No. 48, Ex. H, at 179.) There is no expert testimony in the record to indicate that radon testing was necessary. There was no remedial action taken on the part of plaintiffs, and although plaintiffs tested their basement for Radon, we do not see how this can be characterized as a response to the release or threatened release of sewage from the Authority's sanitary sewers.

Second, the Cunninghams include a series of personal checks as part of their exhibits opposing summary judgment; the exhibit is labeled in part, "medical bill payments." Two of these checks are made out to the Bloomsburg Hospital and one is drafted to MSHMC Physicians Group. The other checks included in the exhibit are made out to United Water Pa. and PPL Elect. Utilities. All of the checks are dated between July and September 2001. In plaintiffs' Response to Statement of Material Facts it is stated that "[t]he Cunninghams have incurred medical expenses in the amount of $394.76." (Rec. Doc. No. 55, at 7, ¶ 49.) However, the total of the three medically related checks provided in exhibit 6 equals $345.84. Regardless, some monies were spent on medical testing.

Defendant perfunctorily contends, without citing to authority, that "medical examinations are not 'response costs' as defined by CERCLA." (Rec. Doc. No.

59, at 7.)  First, we acknowledge that other courts of appeals have held that medical

monitoring costs are not "response costs" under CERCLA.  Durfey v. E.I. DuPont

De Nemours & Co., 59 F.3d 121, 125 (9th Cir. 1995) (citing Price v. U.S. Navy, 39

F.3d 1011, 1015 (9th Cir. 1994)); Daigle v. Shell Oil Co., 972 F.2d 1527, 1535

(10th Cir. 1992).  The Third Circuit, however, has found that a claim for monitoring

is cognizable under CERCLA, so long as the plaintiff can show that (1) the

defendant's release or the threatened release of  hazardous material produced a

reasonable risk of contamination to the plaintiff's property, and (2) the plaintiff

incurred its monitoring and evaluation costs in a reasonable manner.  The circuit

court has stated that a plaintiff seeking to recover for medical monitoring under

CERCLA must establish the same elements as the common law claim for medical

monitoring, which includes the requirement that plaintiff has a significantly

increased risk of contracting a latent disease.  See Redland Soccer Club, Inc. v.

Dep't of U.S. Army, 55 F.3d 827, 849 n.12 (3d Cir. 1995) (stating that the

"elements of a claim for medical monitoring under CERCLA and HSCA are the

same as the elements for a common law medical monitoring claim").[5]

---

[5]A plaintiff alleging a medical monitoring claim must prove: (1) exposure
greater than normal background levels; (2) to a proven hazardous substance; (3)
caused by the defendant's negligence; (4) as a proximate result of the exposure,
plaintiff has a significantly increased risk of contracting a serious latent disease; (5)
a monitoring procedure exists that makes the early detection of the disease

Dr. Holland indicated that the Mrs. Cunningham's exposure to hazardous substances could cause leukemia as a "remote theoretical possibility." (Rec. Doc. No. 48, Ex. Q, at 6-7.) Dr. Holland, in evaluating Scott Cunningham noted that he "tried to reassure the family that they would probably not have any long-term effects from the exposure." (Rec. Doc. No. 48, Ex. R, at 4.) According to the testimony of Cunningham, Dr. Meldrum recommended no further tests be conducted on the Cunninghams because all blood work came back normal. (Rec. Doc. No. 48, Ex. F, at 13-15.) There is insufficient evidence for the Cunninghams to proceed to trial to demonstrate that their exposure to hazardous substances created a significantly increased risk in acquiring a latent disease.

Third, the Cunninghams allege that upon advice from the Department of Environmental Protection they destroyed certain foodstuffs stored in their home. (Rec. Doc. No. 48, Ex. F, at 104 & Rec. Doc. No. 48, Ex. H, at 180.) The cost of replacing these foodstuffs is not a response cost because CERCLA does not allow for the recovery of property damage. See Gussack Realty Co., 224 F.3d at 91; Artesian Water Co., 851 F.2d at 649; Young, 394 F.3d at 862; Holloway, 922

---

possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure ; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. Redland Soccer Club, Inc. v. Dep't of the Army, 696 A.2d 137, 145-46 (Pa. 1997).

F.Supp. at 1158-60.

Fourth, plaintiffs hired Cocciardi & Associates to conduct an expert investigation related to the litigation, and therefore this expense, although large, is not a "response cost" within the meaning of CERCLA. Blackhorse Lane Assoc., 228 F.3d at 294-95; Redland Soccer Club, 55 F.3d at 849-50; see also Keytronic, 511 U.S. at 818-20.

Fifth, plaintiffs' potential costs of any future improvements to the basement of their property are not response costs under section 107. The Authority's sewer pipes, the alleged cause of any release or threatened release of hazardous substances, have already been replaced.

Finally, the costs incurred during plaintiffs' evacuation were incurred by the Red Cross and are not response costs. (Rec. Doc. No. 48, Ex. G, at 125); see 42 U.S.C. § 9601(23) (cleanup removal includes "temporary evacuation and housing of threatened individuals not otherwise provided for . . ." (emphasis added)).

We also note that the evidentiary record also contains insufficient evidence for a reasonable jury to find in favor of Hulsizer on his CERCLA claim at trial. Hulsizer's affidavit indicates that he incurred costs for meals and for lost work when he evacuated his home. (Rec. Doc. No. 56, Ex. 7.) Lost wages are not recoverable under CERCLA as they are an economic injury of traditional tort. See

Holloway, 922 F.Supp. at 1158-60.  Hulsizer has not provided receipts for his meal

expenditures, nor has plaintiff convinced us that his costs could be considered

necessary response costs consistent with the national contingency plan under

CERCLA.

For all of the foregoing reasons plaintiffs did not incur response costs under

CERCLA.  Therefore, judgment in favor of defendant must be granted as to counts

one and two of the complaint.

## IV.  Plaintiffs' Pennsylvania Hazardous Sites Cleanup Act Claims (Counts V & VI)

Plaintiffs have also brought claims for response costs under the Pennsylvania

Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. C.S.A. § 6020.10 et seq..  In

order to make out a prima facie case of liability for response costs under the

HSCA, plaintiffs must establish that: (1) the defendant is a responsible party; (2)

there has been an actual or threatened release of a hazardous substance from a site;

(3) "response costs" were or will be incurred; and (4) the response costs were

"reasonable and necessary or appropriate."  In re Joshua Hill, 294 F.3d 482, 485

(3d Cir. 2002).

The HSCA provides for a private cause of action to recover response costs

under the substantive provisions of 35 Pa. C.S.A. §§ 6020.702 and 6020.1101.  M

& M Realty Co. v. Eberton Terminal Corp., 977 F. Supp. 683, 689 (M.D. Pa.

1997) (Caldwell, J.) (citing Smith v. Weaver, 665 A.2d 1215, 1220-21 (Pa. Super.

Ct. 1995)).  A separate citizen suit provision under the HSCA, 35 Pa. C.S.A. §

6020.1115, allows a party to sue to abate personal injury or property damage that

resulted from the release of a hazardous substance.  The citizen suit provision, 35

Pa. C.S.A. § 6020.1115, contains a notice requirement, while the provisions

providing the right to recover response costs do not.  See Two Rivers Terminal,

L.P. v. Chevron U.S.A., Inc., 96 F. Supp. 2d 426, 429 (M.D. Pa. 2000) (Caldwell,

J.).  One significant difference between a plaintiff bringing a private action and one

bringing a citizen suit is that the Third Circuit has determined that private action

plaintiffs are not entitled to recover litigation costs or attorneys fees, both of which

may be recovered by a plaintiff bringing a citizen suit.  In Re Joshua Hill, 294 F.3d

at 491.

Defendant contends in its motion for summary judgment that plaintiffs did

not file proper notice of intent to sue under the citizen suit provision of the act, and

that therefore, the court has no jurisdiction to hear a citizen suit.  (Rec. Doc. No.

48, at 8, ¶¶ 42-43 & Ex. M, ¶ 7.)  See 35 Pa. C.S.A. § 6020.1115.

First, plaintiffs did not specifically allege that they were pursuing response

costs under a citizen suit in their complaint, instead they generally request "the

damages allowable under that Act." (Rec. Doc. No. 1, at 9-10, ¶¶ 37, 41.)  Only in

plaintiffs' brief opposing summary judgment did they contend that they are seeking

response costs under both a private suit and a citizen suit.  (Rec. Doc. No. 54, at

15.)  In an effort to recover litigation costs and attorney fees, plaintiffs' counsel

contends that although formal notice of intent to sue under the citizen suit provision

was never provided "[a]ll parties were aware of the Cunninghams' claims as well

the Hulsizer claim and the intent to seek legal redress in the Courts."  (Rec. Doc.

No. 54, at 17.)  In support of this claim, plaintiffs assert their August 2001 letters to

the Town of Bloomsburg and the Municipal Authority giving notice of suit under 42

Pa. C.S.A. § 5522(a) provided sufficient notice (Rec. Doc. No. 54, at 16 (citing

Rec. Doc. No. 48, Ex. N.)), that the stipulation of settlement between the Municipal

Authority and the Department was "based upon the fact that further litigation would

ensue by the Plaintiffs" (Id. at 16-17 (citing Rec. Doc. No. 56, Ex. 9)), and that a

newspaper article outlined the potential litigation (Id. at 17 (citing Rec. Doc. No. 56,

Ex. 8).  Plaintiffs contend that oral or constructive notice to the Department of

Environmental Protection and the Municipal Authority is sufficient, because there is

no set method for notice under the citizen suit provision.

        We are not persuaded by plaintiffs' amalgam of arguments that they

provided notice of a citizen suit.  We agree with defendant that plaintiff has

produced no evidence that the Pennsylvania Department of Environmental Protection was ever notified of plaintiffs' intent to file a citizen suit.  There is nothing in the stipulation of settlement to indicate that it was based on plaintiffs' intent to file the instant litigation.  Plaintiffs cannot pursue a citizen suit under the HSCA because they failed to provide the requisite notice.  35 Pa. C.S.A. § 6020.1115.

Plaintiffs' private action for response costs under the HSCA fails for the same reasons that their CERCLA claims fail: plaintiffs have failed to incur response costs.  The only documented receipts and invoices that could possibly be construed as recoverable costs are the medical payments made by the Cunninghams.  The HSCA does provide for the recovery of the "cost of a health assessment or health effects study."  35 Pa. C.S.A. § 6020.701(a)(5).  The health assessment provision is distinct from the response cost provision allowing recovery for "reasonable and necessary or appropriate costs of response incurred by any other person."  35 Pa. C.S.A. § 6020.701(a)(3).  However, the definition of "response" includes "[a]ctions at or near the location of the release, such as studies; health assessments. . . . and monitoring and maintenance reasonably required to assure that these actions protect the public health, safety and welfare and the environment."  35 Pa. C.S.A. § 6020.103.

38

The parties have not provided any case law, nor have we been able to identify case law, that provides that a private medical examination, taken on one's own initiative, is a response cost under the HSCA.  The text of these provisions suggest that a private individual examination for medical care without the initiation of the Pennsylvania Department of Environmental Protection as part of its investigation cannot be considered a response cost or health assessment recoverable as individual response cost.  For all of the foregoing reasons, plaintiffs have failed to provide sufficient evidence so that a reasonable jury could award in their favor on the response cost claims under the HSCA.

## V.  Plaintiffs' Negligence, Nuisance, and Medical Monitoring Claims & Municipal Agency Immunity (Counts VII-XII)

### A.  Negligence Claims (Counts VII & VIII)

Counts VII and VIII of the complaint allege a theory of negligence as a basis for tort liability.  The Authority asserts it is immune from these claims.  As a municipal agency, the Authority is entitled to immunity from tort claims unless the conduct falls within one of the narrow exceptions to the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA").  42 Pa. C.S.A. §§ 8541, 8542.

In order to impose liability on a municipal agency three conditions must be met.  First, the damages must be recoverable under common law or a statute

creating a cause of action if the injury were caused by a person not having a defense available under 42 Pa. C.S.A. §§ 8541, 8542(a)(1).  Second, the injury must have been caused by the municipal agency or an employee of the municipal agency acting within the scope of his or her office or duties.  42 Pa. C.S.A. § 8542(a)(2).  Third, the negligent action must fall within one of the narrow exceptions to government immunity set forth in 42 Pa. C.S.A. § 8542(b). Lindstrom v. City of Corry, 763 A.2d 394, 397 (Pa. 2000).  Exceptions to the general grant of immunity are to be construed narrowly against plaintiffs. Canty v. City of Philadelphia through Philadelphia Domestic Relations Div. Child Support Enforcement Units I & II, 99 F. Supp. 2d 576, 581 (E.D. Pa. 2000) (citing Mascaro v. Youth Study Center, 523 A.2d 1118 (Pa. 1987)); Lindstrom, 763 A.2d at 397 (Pa. 2000).  Plaintiff has the burden of proving that all three conditions are met.  42 Pa. C.S.A. § 8542(a); Sweeney v. Merrymead Farm Inc., 799 A.2d 972, 977 (Pa. Commw. Ct. 2002); Merz by Merz v. City of Philadelphia, 719 A.2d 1131, 1132 n.2 (Pa. Commw. Ct. 1998).

At issue in this case is the utility service facilities exception.  42 Pa. C.S.A. § 8542(b)(5). That exception provides:

> A dangerous condition of the facilities of steam, sewer,
> water, gas or electric systems owned by the local agency
> and located within rights-of-way, except that the claimant

> to recover must establish that the dangerous condition
> created a reasonably foreseeable risk of the kind of injury
> which was incurred and that the local agency had actual
> notice or could reasonably be charged with notice under
> the circumstances of the dangerous condition at a
> sufficient time prior to the event to have taken measures
> to protect against the dangerous condition.

Id.

Therefore, in order to survive summary judgment on its negligence-based claims

plaintiffs must make out a prima facie case of the following elements: (1) that the

Authority's sewers were in a dangerous condition; (2) that the sewers caused the

injury; (3) that the kind of injury the plaintiffs incurred was reasonably foreseeable;

(4) that the Authority had actual or constructive notice of the dangerous condition

of its sewers; and (5) that the Authority could be charged with notice sufficiently

prior to the injury causing event so that the Authority could take remedial measures.

Defendant contends that plaintiff has not made out even a prima facie case of these

elements.  We will not address each of these elements, because we find it apparent

that plaintiff cannot prove the Authority was under sufficient notice of a dangerous

condition in its sewers.  Therefore, we now address how plaintiffs' case is

inadequate, with all reasonable inferences from the evidence taken in plaintiffs'

favor, as to the fourth and fifth elements necessary to establish municipal agency

liability under the utility facility service exception.

41

The utility facility service exception requires that the "local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition."  42 Pa. C.S.A. § 8542(b)(5).  Plaintiffs have not adduced sufficient evidence that defendant had actual or constructive notice that the sewers were in a dangerous condition.

Beginning on March 3, 2001, and at various times thereafter, one or more of the plaintiffs experienced odors either inside their homes or in the outside air in the Cherry Street Area.  (Rec. Doc. No. 48, Ex. N.)  On March 3, 2001, the Cunninghams reported the odors to various entities, but did not notify the Authority.  The Authority received notice on March 19, 2001.  The evidence in the record indicates that prior to March 3, 2001, the Authority was contacted about odors in the Cherry Street area on only one occasion.  That report occurred on December 19, 1996.  No other reports of odors in the Cherry Street Area were made to the Authority between December 19, 1996 and March 19, 2001.  By March 29, 2001, the Authority had conducted a televisual inspection of a portion of the sewers and a smoke test.  On April 9, 2001, the Authority tested another portion of the sewers.  Shortly thereafter, the Authority replaced the damaged sanitary sewers.  And on July 3, 2001, Roto-Rooter replaced the broken lateral sewer leading to the

Cunninghams' property.  (Rec. Doc. 48, Ex. A, at 26.)

Plaintiffs have not adduced any evidence to support a claim that defendant received sufficient notice of the cracked condition of the sewers before plaintiffs began to experience odors in their homes on March 3, 2001.  Defendant asserts that the damaged portions of the sewers in the Cherry Street Area were twenty feet or more from the nearest manhole, and not observable without inserting televisual equipment into the sewer.  The sewers in question did not collapse so as to cause the ground to subside or to create any other physical manifestation of their condition. (Rec. Doc. No. 48, ¶ 43.)  The sewers are approximately 75 years old and made of clay.  Although plaintiffs dispute defendant's characterization of the pipes in the Town of Bloomsburg as normal for their age and materials, defendant's assertion is based on expert reports, while plaintiffs have failed to adduce sufficient evidence to the contrary.  Furthermore, once a visual inspection of the pipes revealed that there were sections in need of repair the Authority took swift action.  Plaintiffs have not come forward with sufficient evidence to proceed to trial on the issue of whether the Authority had sufficient notice; no reasonable inference could be made from the evidence provided that the Authority was aware or should have been aware of the condition of the sewers in the Cherry Street Area.  Thus, plaintiffs have failed to adduce enough evidence to prove an exception to the

PSTCA that would allow for the municipal agency to be liable.  Therefore, the Authority is immune to plaintiffs' negligence claims.

## B.  Nuisance Claims (Counts IX & X)

Plaintiffs in Counts IX and X of their complaint allege claims of nuisance. The counts appear to be hastily drafted and it is difficult to determine upon which common-law theory of nuisance they intend to rely.[6]  Plaintiffs refer to the creation of a "public nuisance" in paragraphs under counts V and VI, paragraphs which are incorporated into their nuisance counts.  Plaintiffs allege that the nuisance was a result of the reckless and/or negligent acts of defendant.

We note in passing that the Pennsylvania courts have recognized absolute nuisance claims involving sewage.  Smith v. Kings Grant Condo., 640 A.2d 1276, 1280 (Pa. 1993).  The Pennsylvania Supreme Court, quoting the Superior Court, noted that "[u]nder such a doctrine a plaintiff need only show that sewage from defendant's land has travelled [sic.] onto plaintiff's land and that plaintiff has been injured thereby. Negligence need not be shown, liability being absolute."  Id. at 1280 (quoting Smith v. Kings Grant Condo., 614 A.2d 261, 267 (Pa. Super Ct. 1992)).  Of course because defendant is a municipal agency, only a tort claim that

_____

[6]In Count IX of the complaint, nuisance is also spelled as "nucence" and "nascence."

falls within an enumerated exception to the governmental immunity provided by the

PSTCA may be pursued.  Since we have found that plaintiffs have not adduced

sufficient evidence to prove an exception to the PSTCA their claim for nuisance

must fail.

## C.  Medical Monitoring Claims (Counts XI and XII)

In Counts XI and XII of the complaint plaintiffs bring medical monitoring

claims against the Authority.  The complaint avers that as a result of being exposed

to "proven hazardous substances" plaintiffs have a "significantly increased risk of

contracting cancer."  (Rec. Doc. No. 1, at 16-17, ¶¶ 60, 61, 65, 66.)

In 1996, following the Third Circuit's prediction, the Pennsylvania Supreme

Court recognized a common law claim for medical monitoring.  Simmons v. Pacor,

Inc., 674 A.2d 232, 239-40 (Pa. 1996).  A plaintiff alleging a medical monitoring

claim must prove: (1) exposure greater than normal background levels; (2) to a

proven hazardous substance; (3) caused by the defendant's negligence; (4) as a

proximate result of the exposure, plaintiff has a significantly increased risk of

contracting a serious latent disease; (5) a monitoring procedure exists that makes

the early detection of the disease possible; (6) the prescribed monitoring regime is

different from that normally recommended in the absence of the exposure ; and (7)

the prescribed monitoring regime is reasonably necessary according to

contemporary scientific principles.  Redland Soccer Club, Inc. v. Dep't of the Army, 696 A.2d 137, 145-46 (Pa. 1997).

As the third element indicates a medical monitoring claim sounds in negligence, the Authority is entitled to immunity for the reasons set forth previously.

Furthermore, plaintiffs have failed to adduce evidence which indicates that there is a long term increased risk of cancer to the Cunningham family and Hulsizer that would require medical monitoring.  A plaintiff must support a medical monitoring claim with substantial expert testimony.  Redland, 696 A.2d at 146; Foust v. S.E. Pa. Transp. Auth., 756 A.2d 112, 121 (Pa. Commw. Ct. 2000) (citation omitted).  Defendant's expert has offered an uncontradicted report that "all of the individual chemical cancer risks, as well as the cumulative cancer risk are well below even the lower bound of the U.S. E.P.A. target risk range."  (Rec. Doc. No. 48, Ex. T, at 4-6.)  As to Hulsizer, plaintiffs have provided no medical testimony, and he testified that he is not sure that anyone ever told him that he is at risk.  (Rec. Doc. No. 48, Ex. G, at 114-15.)  Thus, even if the Authority were not immune, plaintiffs have not adduced sufficient evidence to proceed to trial on a claim for medical monitoring for cancer.

## CONCLUSION:

Defendant's motion for summary judgment will be granted.

_____s/ James F. McClure, Jr._____
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL CUNNINGHAM and          :
ANNA CUNNINGHAM, his
wife, and as Guardians of SCOTT    :
CUNNINGHAM, and CLAYTON
HULSIZER, III,                              :
              Plaintiffs          Civil No. 4:03-CV-0268
                           :

        v.                              :          Judge McClure

                           :

MILCO INDUSTRIES INC., and
BLOOMSBURG MUNICIPAL        :
SEWER AUTHORITY,
             Defendants  :

# O R D E R

April 26, 2005

For the reasons set forth in the accompanying memorandum,


**NOW, THEREFORE, IT IS ORDERED THAT:**

1.     Plaintiffs' exhibits 13 and 14 (Rec. Doc. Nos. 57 & 58), are stricken

        from the record.

2.     The motion of Bloomsburg Municipal Sewer Authority for summary

        judgment on the complaint is granted.  (Rec. Doc. No. 48.)

3.     Final judgment is entered in favor of defendant Bloomsburg Municipal

1

Sewer Authority and against plaintiffs.

4.      The Clerk is directed to close the case file.


    s/ James F. McClure, Jr.    
James F. McClure, Jr.
United States District Judge